**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

|                                      |   |                         |
|--------------------------------------|---|-------------------------|
| GOSHAWK DEDICATED LIMITED,           | : |                         |
|                                      | : |                         |
|                                      | : |                         |
|                                      | : |                         |
| Plaintiff,                           | : |                         |
|                                      | : | CIVIL ACTION NO.        |
| v.                                   | : | 1:06-CV-274-RWS         |
|                                      | : |                         |
| PORTSMOUTH SETTLEMENT COMPANY I, INC.,| : |                        |
|                                      | : |                         |
| Defendant.                           | : |                         |

## <u>ORDER</u>

Plaintiff Goshawk Dedicated Ltd. ("Goshawk"), a British insurance underwriting company, brought this action against Defendant Portsmouth Settlement Company I, Inc. ("PSC"), a Georgia-based investment company, seeking a court order compelling arbitration, and in the alternative, alleging fraud against PSC in the procurement of an insurance policy.  (<u>See</u> Pl.'s Compl. [1-1].)  This case comes before the Court on Defendant's Motion to Dismiss [10] and Plaintiff's Motion to Compel Arbitration [18].  For the reasons that follow, the Court concludes that the Convention on the Recognition and

Enforcement of Foreign Arbitral Awards requires arbitration in this case.
Accordingly, the Court grants Plaintiff's Motion to Compel Arbitration.  The
Court also concludes that the issues raised by PSC in its Motion to Dismiss are
proper for arbitrators, and not the Court, to decide.  Accordingly, the Court
denies Defendant's Motion to Dismiss.

## Background

This case arises out of a cost contingent insurance policy entered into
between the parties in January 1999, under which Goshawk insured PSC
against losses related to PSC's investment in the secondary life insurance
market.  (See Ex. A to Pl.'s Compl. [hereinafter "CCI Policy"] [1-2]).  Before
turning to the merits of the parties' Motions, the Court briefly reviews and
accepts as true the factual allegations contained in the Complaint.

In January 1999, PSC, as a substantial part of its business, invested in the
secondary life insurance market by purchasing life insurance policies from
individual life insureds.  In a typical transaction, PSC made a lump sum
payment to a life insured, and in return took over the life insured's policy by
paying the remaining premiums due on that policy (usually up to the death of

2

the life insured) and then receiving its proceeds upon the death of the life insured.

As a part of each transaction, PSC analyzed the likely life expectancy of the life insured to determine the value of the policy.[1]  To this end, PSC contracted with American Viatical Services, LLC ("AVS") to obtain life expectancy ("LE") evaluations that predicted, through medical record analysis, the remaining longevity of the life insured.  PSC used these LEs to evaluate the life insurance policies it purchased, and later to procure insurance from Goshawk.

Because PSC bore the risk that any individual life insured would live substantially longer than predicted by an LE—which would consequently cause PSC a significant loss—PSC entered into a contingent cost insurance ("CCI") policy with Goshawk in January 1999 to mitigate against that risk.  Under the CCI Policy, Goshawk insured PSC against the risk that any individual on a

---

[1]  All else being equal, a person with a shorter life expectancy (and thus a person who was predicted to have a policy with a shorter maturity) had a more valuable policy than a person with a longer life expectancy because a policy with a shorter maturity would cost PSC less and generate more revenue.  That is, a policy that has a shorter maturity requires PSC to pay fewer premiums than a policy with a longer maturity, and its proceeds, which are paid sooner than a later-maturing policy, have a higher present value.

covered life insurance policy would outlive his or her life expectancy beyond a specified period of time.  Thus, the CCI Policy required PSC to provide Goshawk with the LEs connected to PSC's life insurance investments to determine when insurance coverage would be triggered.

In addition to outlining the terms of the agreement between PSC and Goshawk, the CCI Policy contains an arbitration clause purporting to require arbitration in London, England.  The Arbitration Clause provides:  "All disputes and differences arising under or in connection with this Policy shall be referred to arbitration under ARIAS Arbitration Rules . . . The seat of arbitration shall be London, England."  (See CCI Policy, Arbitration Clause, ¶¶ 9-10.)  The CCI Policy also contains a choice-of-law provision, which provides:  "This policy shall be subject to the Laws of England."  (See CCI Policy, Conditions, ¶ 9.)

On April 22, 1999, approximately three months after the parties entered into the CCI Policy, PSC assigned all of its interest in the CCI Policy to ROP, Inc.  Several years later, Goshawk began incurring significant losses relating to the CCI Policy, and concluded that PSC had fraudulently manipulated the LEs it provided to Goshawk to recover greater insurance proceeds.  This action followed.

**Discussion**

**I.      Plaintiff's Motion to Compel Arbitration**

Goshawk moves this Court to compel arbitration pursuant to the arbitration clause contained in the CCI Policy.  PSC, seeking to avoid arbitration on foreign soil, raises two defenses to enforcement.  First, PSC argues that an agreement to arbitrate no longer exists between PSC and Goshawk.  Specifically, PSC argues that its assignment to ROP, Inc. of its interest in the CCI Policy in April 1999 constituted a novation under Georgia law, which extinguished PSC's obligation to arbitrate under its original agreement with Goshawk.  Second, PSC argues that, assuming that an arbitration agreement exists, it is, in any event, unenforceable under O.C.G.A. § 9-9-2, which renders arbitration clauses in insurance contracts void as against public policy.  The Court addresses each of PSC's contentions in turn.

**A.      The "Existence" of an Agreement to Arbitrate**

As stated, PSC argues that, as a result of its April 1999 novation of its CCI Policy with Goshawk, it is discharged from any obligation to arbitrate because the agreement between Goshawk and PSC no longer exists.  In response, Goshawk does not dispute that PSC's assignment to ROM, Inc.

constituted a novation.  Instead, Goshawk argues that its original agreement to

arbitrate survives the parties' novation, and continues to control any dispute

arising out of the performance of its original agreement with PSC.  For the

reasons provided below, the Court agrees with Goshawk's contention and

concludes that the arbitration clause in the parties' original agreement remains

in effect.

### 1.    Applicable Law

As an initial matter, the parties dispute whether English or Georgia law

applies in determining the effect of a novation on a prior agreement to arbitrate.

On a motion to compel arbitration, courts may consider certain issues

relating to the enforceability of an arbitration agreement when such questions

are not within the body of substantive questions reserved for resolution by

arbitrators.  See Love v. Money Tree, Inc., 614 S.E.2d 47, 50 & n.15 (Ga. 2005)

(holding that the question of arbitrability "is not an issue that goes to the merits

of the parties' underlying dispute, but instead . . . may be decided by a court");

see also AT&T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 649,

106 S. Ct. 1415, 89 L. Ed. 2d 648 (1986) ("Unless the parties clearly and

unmistakably provide otherwise, the question of whether the parties agreed to

6

arbitrate is to be decided by the court, not the arbitrator."); <u>Great Am. Trading</u>

<u>Corp. v. I.C.P. Cocoa, Inc.</u>, 629 F.2d 1282, 1288-89 (7th Cir. 1980) (reversing

trial court for failing to consider the threshold question of whether valid

agreement to arbitrate existed in light of one party's contention that contract

was novated).   Indeed, the Supreme Court recently reaffirmed that it is for

courts, not arbitrators, to decide "whether the parties have a valid arbitration

agreement at all."   <u>Green Tree Fin. Corp. v. Bazzle</u>, 539 U.S. 444, 452, 123 S.

Ct. 2402, 156 L. Ed. 2d 414 (2003); <u>see</u> <u>also</u> <u>Terminix Int'l Co. v. Palmer</u>

<u>Ranch Ltd. P'ship</u>, 432 F.3d 1327, 1331 (11th Cir. 2005).

It is equally clear that courts examining threshold questions of

contractual formation must apply state law in determining whether an

agreement to arbitrate exists.  <u>See</u> <u>Caley v. Gulfstream Aerospace Corp.</u>, 428

F.3d 1359, 1368 (11th Cir. 2005); <u>see</u> <u>also</u> <u>Perry v. Thomas</u>, 482 U.S. 483, 492

n.9, 107 S. Ct. 2520, 96 L. Ed. 2d 426 (1987) (stating that, on a motion to

compel arbitration, "state law, whether of legislative or judicial origin, is

applicable if that law arose to govern issues concerning the validity,

revocability, and enforceability of contracts generally").  Therefore, even where

parties have included a choice-of-law provision, Georgia courts have applied

7

Georgia law in determining whether an arbitration agreement is enforceable in the first instance.  See Cont'l Ins. Co. v. Equity Residential Props. Trust, 565 S.E.2d 603, 604-05 (Ga. Ct. App. 2002) (concluding that, despite Illinois choice-of-law provision in insurance agreement, Georgia law controlled question of whether provision was enforceable under public policy of Georgia).

Applying these principles to the case at bar, the Court concludes that Georgia law applies in determining whether the parties' novation extinguished their agreement to arbitrate.  Although the CCI Policy calls for the application of English law, PSC's contractual defense of novation concerns the question of whether a valid agreement to arbitrate exists.  It requires the Court, at the threshold, to determine the arbitrability of the dispute in light of a defense raised under general principles of contract law.  As such, Georgia law controls.[2]

2.    Novation Does not Extinguish Obligation to Arbitrate

Having concluded that Georgia law controls the first defense raised by PSC, the Court turns to examine what appears to be a question of first

_____

[2] The parties do not contend that the law of any other state applies in determining whether a contract exists as between the parties.

8

impression in Georgia: whether a novation extinguishes the original parties'

obligation to arbitrate disputes between one another.  The Court concludes that

it does not.

Under Georgia's law of novation, "if new parties are introduced so as to

change the person to whom the obligation is due, the original contract is at an

end." O.C.G.A. § 13-4-5.  PSC argues that, because its contract with Goshawk

was novated and is therefore "at an end," its arbitration agreement within that

contract has been similarly extinguished.  While the text of Georgia's novation

statute may give superficial appeal to PSC's contention, two principal

considerations convince this Court that, despite novation, the arbitration clause

in the CCI Policy nonetheless remains in effect as to disputes arising out of that

agreement.

First, although no Georgia case has considered the effect of a novation on

a prior agreement to arbitrate, it appears that all courts which have directly

addressed the issue have held that, absent a showing that the parties specifically

agreed to retroactively rescind or terminate the arbitration agreement itself, an

arbitration agreement generally survives novation and remains enforceable

against an original party.  Compare <u>Bank of Am., N.A. v. Diamond State Ins.</u>

<u>Co.</u>, No. 1 Civ. 0645LMMGWG, 2002 WL 31720328, at *3 (S.D.N.Y. Dec. 4, 2002) ("Although a novation agreement generally terminates prior contracts between parties, the novation agreement here does not preclude arbitration of the issues.  The facts that give rise to these issues occurred between [the parties] in relation to the formation of the original reinsurance contract and therefore are not affected by the novation agreement."); <u>See</u> <u>Nat'l R.R. Passenger Corp. v. Boston & Maine Corp.</u>, 850 F.2d 756, 764 (D.C. Cir. 1988) (holding that broad arbitration clause creates presumption that agreement to arbitrate outlives performance of contract and thus subsequent novation did not eviscerate prior agreement to arbitrate); <u>Rainbow Invs., Inc. v. Super 8 Motels, Inc.</u>, 973 F. Supp. 1387, 1391 (M.D. Ala. 1997) (enforcing arbitration clause over party's contention that subsequent agreement extinguished arbitration clause); <u>Primex Int'l Corp. v. Wal-Mart Stores</u>, 679 N.E.2d 624, 628 (N.Y. 1997) (holding that arbitration clause survived expiration of agreement and formation of new agreement with merger clause and without arbitration clause); <u>Otan Inv., LLC v. Trans Pac. Trading, Ltd.</u>, No. C05-2135JLR, 2006 WL 1075225, at *3 (W.D. Wash. Apr. 20, 2006) <u>with</u> <u>Goss-Reid Assoc. Inc. v. Tekniko Licensing Corp.</u>, 54 Fed. App'x 405, 407 (5th Cir. 2002) (concluding that second agreement

10

among parties to original contract, which contained no arbitration clause and stated that "[t]his agreement supersedes all prior agreements," specifically rescinded the parties' prior arbitration agreement contained in the original contract).  Because PSC has pointed to no language in the parties' novation agreement which would indicate that the parties specifically intended to rescind their original agreement to arbitrate, the weight of authority suggests that the original agreement to arbitrate remains enforceable.[3]

Moreover, it is well settled that an arbitration clause may be enforced after the *termination* of a contract.  See <u>Montgomery Mailers' Union No. 127 v. Advertiser Co.</u>, 827 F.2d 709, 712 (11th Cir. 1987) (citing <u>Nolde Bros., Inc.</u>

---

[3]  PSC cites the Seventh Circuit's decision in <u>Great American Trading</u> for the proposition that a novation may extinguish a prior arbitration clause in the parties' original agreement.  629 F.2d at 1288 (stating that one party's "contention that the negotiations subsequent to the execution of the August 20 contract constituted a novation of the contract raises the threshold issue of whether a contract and the making of an agreement to arbitrate existed with regard to the dispute between the parties").  (<u>See</u> Def.'s Br. in Opp. to Mot. to Compel [25-1] at 5.)  PSC's reliance on <u>Great American Trading</u>, however, is misplaced.  <u>Great American Trading</u> concerned the issue of whether a novation of an agreement between the same parties (*i.e.*, a modification) superseded their prior agreement which contained an arbitration clause.  It did not involve the situation in which, as here, a party is replaced with another party by novation.  Moreover, while <u>Great American Trading</u> may suggest that an arbitration clause *itself* can be novated by subsequent agreement, it does not announce the unprecedented rule that *any* subsequent agreement amounting to a novation retroactively extinguishes an original party's prior obligation to arbitrate.  629 F.2d at 1288.

AO 72A
(Rev.8/82)

v. Local No. 358, Bakery & Confectionery Workers Union, AFL-CIO, 430 U.S. 243, 252, 97 S. Ct. 1067, 51 L. Ed. 2d 300 (1977)). As the Supreme Court has reasoned, an arbitration provision may survive the termination of a contract because it is a "structural provision" that relates to remedies and dispute resolution, and not an obligation concerning performance. Litton Fin. Printing Div., a Div. of Litton Bus. Sys., Inc. v. N.L.R.B., 501 U.S. 190, 208 & n.3, 111 S. Ct. 2215, 115 L. Ed. 2d 177 (1991) (citing Mendez v. Trustees of Boston Univ., 285 N.E.2d 446, 448 (Mass. 1972)); Nolde Bros., Inc., 430 U.S. at 252.[4]

---

[4]  See also Mendez, 285 N.E.2d at 448 ("The termination of a contract, whether by rescission according to its terms, by abandonment, by termination for justifiable cause, or otherwise, does not necessarily terminate a provision for arbitration or other agreed procedure for the resolution of disputes."); Coudert v. Paine Webber Jackson & Curtis, 705 F.2d 78, 81 (2d Cir. 1983) ("[G]rievances based on conditions arising 'during the term of the agreement to arbitrate' are arbitrable after the term has ended."); Jackson Mills, Inc. v. BT Capital Corp., 440 S.E.2d 877, 879 (S.C. 1994) (stating that "[a]rbitration clauses are separable from the contracts in which they are imbedded" and thus "a party cannot avoid arbitration through rescission of the *entire* contract when there is no independent challenge to the *arbitration* clause [itself]" (emphasis in original) (citations omitted)); State ex rel. Ranger Fuel Corp. v. Lilly, 267 S.E.2d 435, 437 (W. Va. 1980) (noting the "general rule that the duty to arbitrate under an arbitration clause in a contract survives termination of the contract"); 6 C.J.S. Arbitration § 12 ("An agreement to arbitrate disputes arising under a contract also survives the expiration or termination of the contract, although the arbitration provision does not apply as to claims arising after the expiration of the contract."); 4 AM. JUR. 2d ALTERNATIVE DISPUTE RESOLUTION § 79 ("The termination of the contract prior to a demand for arbitration will generally have no effect on such demand, provided that the dispute in question either arose out of the terms of the contract or arose when a broad contractual arbitration clause was still in effect.").

Because the effect of a novation is "to terminate the old agreement and to substitute or create one that is entirely new," Ebensberger v. Sinclair Refining Co., 165 F.2d 803, 806 (5th Cir. 1948), the well-established rule that contractual termination does not extinguish an agreement to arbitrate thus applies with equal force in the context of a novation.  See Primex Int'l Corp., 679 N.E.2d at 628 (reasoning that rules of termination apply similarly to novation).

PSC argues, however, that the plain language of O.C.G.A. § 13-4-5, which provides that the contract is "at an end," requires a different result.  But O.C.G.A. § 13-4-5 is not at odds with the weight of authorities discussed above, or the general rule that contractual termination does not extinguish an agreement to arbitrate.  To the contrary, O.C.G.A. § 13-4-5 codifies the principle that the effect of a novation on an arbitration clause is equivalent to the effect of contractual termination.  Id.  Under the rules of termination outlined above, arbitration agreements are presumed to survive the termination of a contract.  Because PSC has failed to overcome this presumption by demonstrating that the parties specifically agreed to rescind their original

agreement to arbitrate, the Court concludes that an agreement to arbitrate exists

between PSC and Goshawk.

   **B.    The "Validity and Enforceability" of the Agreement to
          Arbitrate**

   Having concluded that an agreement to arbitrate exists, the Court turns to

examine whether it is valid and enforceable.  In its second contention, PSC

argues that the arbitration clause in the CCI Policy is unenforceable because

O.C.G.A. § 9-9-2(c)(3), as applied through the McCarran-Ferguson Act, 15

U.S.C. § 1012(b), renders the arbitration clause in the CCI Policy void.  See

O.C.G.A. § 9-9-2(c)(3) (prohibiting enforcement of arbitration agreements in

insurance contracts).  In response, Goshawk argues that neither Georgia law nor

the McCarran-Ferguson Act governs the arbitration agreement at issue here

because it comprises an international agreement.  Rather, Goshawk contends

that the United Nations Convention on the Recognition and Enforcement of

Foreign Arbitral Awards, opened for signature June 10, 1958, 21 U.S.T. 2517,

330 U.N.T.S. 3 (the "Convention"), and its implementing legislation, 9 U.S.C.

§§ 202-208 (2002) (the "Convention Act"), control the parties' agreement and

require its enforcement.

As a matter of first impression in this district, the Court concludes that the Convention supersedes the McCarran-Ferguson Act and warrants the enforcement of the agreement at issue here.

    1.    <u>Background Law</u>

        a.    <u>Domestic Law Applicable to Insurance Contracts</u>

Under the McCarran-Ferguson Act, 15 U.S.C. § 1011 <u>et seq</u>., state laws that regulate the business of insurance generally take precedence over federal laws which are not specifically applicable to the business of insurance and which have the effect of impairing state insurance laws.  The McCarran-Ferguson Act provides in pertinent part:

> No act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance. . . .

15 U.S.C. § 1012(b).

Congress enacted the McCarran-Ferguson Act in 1945 to "restore the supremacy of the States in the realm of insurance regulation."[5]  <u>U.S. Dept. of</u>

---

[5]  The McCarran-Ferguson Act was enacted in reaction to the Supreme Court's decision in <u>United States v. South-Eastern Underwriters Ass'n</u>, 322 U.S. 533, 64 S. Ct. 1162, 88 L. Ed. 1440 (1944), which had held that the Sherman Act preempted state

AO 72A
(Rev.8/82)

Treasury v. Fabe, 508 U.S. 491, 500, 113 S. Ct. 2202, 124 L. Ed. 2d 449

(1993).  The McCarran-Ferguson Act leaves insurance regulation to the states,

and "ensure[s] that federal statutes not identified in the Act or not yet enacted

would not automatically override state insurance regulation."  Humana Inc. v.

Forsyth, 525 U.S. 299, 306, 119 S. Ct. 710, 142 L. Ed. 753 (1999).  Congress,

"[b]elieving that the business of insurance is 'a local matter,' . . . explicitly

intended the McCarran-Ferguson Act to restore state taxing and regulatory

powers over the insurance business."  W. & S. Life Ins. Co. v. State Bd. of

Equalization of Cal., 451 U.S. 648, 654, 101 S. Ct. 2070, 68 L. Ed. 2d 514

(1981) (citing H. R. Rep. No. 143, 79th Cong., 1st Sess., 2 (1945)).  Indeed,

"the Act does not seek to insulate state insurance regulation from the reach of

all federal law," but rather, "it seeks to protect state regulation primarily against

inadvertent federal intrusion—say, through enactment of a federal statute that

describes an affected activity in broad, general terms, of which the insurance

---

insurance legislation despite the Sherman Act's "highly general language [that says]
nothing specifically about insurance."  Barnett Bank of Marion County, N.A. v. Nelson,
517 U.S. 25, 40, 116 S. Ct. 1103, 134 L. Ed. 2d 237 (1996).  Congress's intention was to
"cautiously avoid[] similar unanticipated interferences with state regulation in the future."
Id.

AO 72A
(Rev.8/82)

business happens to constitute one part."  <u>Barnett Bank of Marion County, N.A.</u> <u>v. Nelson</u>, 517 U.S. 25, 39, 43, 116 S. Ct. 1103, 134 L. Ed. 2d 237 (1996).

Under Georgia law, arbitration clauses in insurance contracts are generally not enforceable.  <u>See</u> O.C.G.A. § 9-9-2(c)(3) (stating that the Georgia Arbitration Code shall not apply to "[a]ny contract of insurance").[6]

Both the Eleventh Circuit and Georgia Supreme Court recently addressed the question of whether, by operation of the McCarran-Ferguson Act, Georgia's anti-arbitration provision "reverse preempts" the Federal Arbitration Act, <u>see</u> 9 U.S.C. § 1 <u>et</u> <u>seq</u> ("FAA"), which would otherwise require the enforcement of arbitration agreements in insurance contracts.  <u>See</u> <u>McKnight v. Chicago Title</u> <u>Ins. Co.</u>, 358 F.3d 854 (11th Cir. 2004); <u>Love v. Money Tree, Inc.</u>, 614 S.E.2d 47 (Ga. 2005).  Both courts concluded that, because O.C.G.A. § 9-9-2(c)(3) was "enacted. . . for the purpose of regulating the business of insurance," it reverse preempts the FAA under the McCarran-Ferguson Act.  <u>See</u> <u>McKnight</u>, 358 F.3d at 858-59; <u>Love</u>, 614 S.E.2d at 50.  Thus, it is clear that, despite the FAA's strong policy favoring the enforcement of arbitration agreements, arbitration

---

[6]  Arbitration agreements "between insurance companies," however, remain enforceable under O.C.G.A. § 9-9-2(c)(3).  The parties do not contend that this exception applies to the instant case.

17

clauses in insurance contracts—at least in the domestic context—are generally

unenforceable in Georgia.

b.    The Convention on the Recognition and Enforcement
of Foreign Arbitral Awards

Goshawk argues that, despite Georgia's prohibition on arbitration

agreements in insurance contracts, the parties' agreement is nevertheless

enforceable because it involves international, and not domestic, commerce.

Relying on a number of district court cases, Goshawk argues that the

McCarran-Ferguson Act applies only to domestic agreements, and thus the

Convention on the Recognition of Foreign Arbitral Awards controls.  See, e.g.,

In re Arbitration Between England Ship Owners Mut. Ins. Ass'n (Luxembourg)

& Am. Marine Corp., No. 91-3645, 1992 WL 37700, at *4-5 (E.D. La. Feb. 18,

1992) ("The McCarran-Ferguson Act does not apply to contracts made under

the Convention, as it was intended to apply only to interstate commerce, not to

foreign commerce.  Likewise, the Convention makes clear that it does not apply

to purely interstate disputes." (citing Triton Lines, Inc. v. Steamship Mut.

Underwriting Assoc., 707 F. Supp. 277, 278-79 (S.D. Tex. 1989)))).[7]  Although

---

[7] Several other district court cases, relying either directly or indirectly on West of
England Ship Owners, have reached a similar conclusion and enforced an international

18

this Court declines to adopt the reasoning of <u>West of England Ship Owners</u>, the

Court concludes that the Convention supersedes the McCarran-Ferguson Act

and thus requires arbitration in this case.[8]

The Convention and its implementing legislation, as a general matter,

require the enforcement of international arbitration agreements. Article II of the

Convention provides in pertinent part:

> Each Contracting State shall recognize an agreement
> in writing under which the parties undertake to submit
> to arbitration all or any differences . . . concerning a

---

arbitration agreement under the Convention notwithstanding the provisions of the
McCarran-Ferguson Act. <u>See</u> <u>Antillean Marine Shipping Corp. v. Through Transp. Mut.</u>
<u>Ins., Ltd.</u>, No. 02-22196-CIV, 2002 WL 32075793, at *3 (S.D. Fla. Oct. 31, 2002)
(relying on <u>West of England Ship Owners</u> and stating that the McCarran-Ferguson Act
"does not apply to international insurance contracts made under the Convention" because
it provides that "the states, and only the states, can regulate the substantive content of
insurance contracts," which "was intended to apply only to interstate commerce, and not
foreign commerce"); <u>see</u> <u>also</u> <u>McDermott Int'l, Inc. v. Underwriters at Lloyd's of</u>
<u>London</u>, No. 91-841, 1992 WL 37695, at *4 (E.D. La. Feb. 14, 1992); <u>Continental Ins.</u>
<u>Co. v. Jantran, Inc.</u>, 906 F. Supp. 362, 366 (E.D. La. 1995); <u>McDermott Int'l, Inc. v.</u>
<u>Underwriters at Lloyd's</u>, No. 91-841, 1996 WL 291803, at *4 (May 30, 1996) (original
<u>McDermott</u> case on motion to confirm award), <u>aff'd on other grounds</u> 120 F.3d 583 (5th
Cir. 1997); <u>Jantran, Inc. v. Sphere Drake Ins., P.L.C.</u>, No. 2:96CV085-D-B,1997 WL
88259, at *1 (N.D. Miss. Feb. 18, 1997); <u>Assuranceforeningen Skuld (Gjensidig) v.</u>
<u>Apollo Ship Chandlers, Inc.</u>, 847 So.2d 991, 993 (Fla. Ct. App. 2003).

[8] As is more fully explained below, the Court does not rest its conclusion on a
construction of the scope of the McCarran-Ferguson Act as applying only to domestic
contracts, as did the court in <u>West of England Ship Owners</u>. Rather, the Court concludes
that the Convention, and the strong international policy it expresses in favor of enforcing
commercial arbitration agreements, supersedes the McCarran-Ferguson Act.

19

> subject matter capable of settlement by arbitration. . . .
> The court of a Contracting State, when seized of an
> action in a matter in respect to which the parties have
> made an agreement within the meaning of this article,
> shall, at the request of one of the parties, refer the
> parties to arbitration, unless it finds that the said
> agreement is null and void, inoperative or incapable of
> being performed.

Convention, art. II.

Congress's implementing legislation, which was passed in 1970, provides in pertinent part:

> An arbitration agreement . . . which is considered as
> commercial, including a transaction, contract, or
> agreement described in section 2 of this title, falls
> under the Convention.  An agreement or award arising
> out of such a relationship which is entirely between
> citizens of the United States shall be deemed not to
> fall under the Convention. . . .

9 U.S.C. § 202.

The Convention, as incorporated into federal law, is intended "to encourage the recognition and enforcement of commercial arbitration agreements in international contracts and to unify the standards by which agreements to arbitrate are observed and arbitral awards are enforced in the signatory countries."  Scherk v. Alberto-Culver Co., 417 U.S. 506, 520 & n.15,

20

94 S. Ct. 2449, 2457, 41 L. Ed. 2d 270 (1974).  It "provide[s] businesses with a widely used system through which to obtain domestic enforcement of international commercial arbitration awards resolving contract and other transactional disputes, subject only to minimal standards of domestic judicial review for basic fairness and consistency with national public policy."  Indus. Risk Insurers v. M.A.N. Gutehoffnungshutte GmbH, 141 F.3d 1434, 1441 (11th Cir. 1998) (citations and quotation omitted).  "As an exercise of the Congress' treaty power and as federal law, '[t]he Convention must be enforced according to its terms over all prior inconsistent rules of law.'"  Id. (citing Sedco, Inc. v. Petroleos Mexicanos Mexican Nat'l Oil Co. (Pemex), 767 F.2d 1140, 1145 (5th Cir. 1985)).

The Eleventh Circuit has recently defined a court's role in deciding a motion to compel arbitration under the Convention.  See Bautista v. Star Cruises, 396 F.3d 1289, 1294 (11th Cir. 2005).  Under Bautista, a district court may only conduct "a very limited inquiry."  Id. (citing Francisco v. STOLT ACHIEVEMENT MT, 293 F.3d 270, 273 (5th Cir. 2002)).  The court must first determine whether four jurisdictional prerequisites to enforcement are met: (1) an agreement in writing within the meaning of the Convention; (2) the

agreement provides for arbitration in the territory of a signatory of the Convention; (3) the agreement arises out of a legal relationship, whether contractual or not, which is considered commercial; and (4) a party to the agreement is not an American citizen, or that the commercial relationship has some reasonable relation with one or more foreign states.  Id. at 1294-95 & n.7 (citing Std. Bent Glass Corp. v. Glassrobots Oy, 333 F.3d 440, 449 (3d Cir. 2003)).

　　　If the four jurisdictional prerequisites are met, the court then must determine whether the party opposing enforcement has any valid affirmative defenses under the Convention.  Id.   The affirmative defenses authorized by the Convention have a "limited scope," see id. at 1302, allowing parties to avoid arbitration only where the arbitration clause is "null and void, inoperative or incapable of being performed" as those terms are defined within the Convention.  Convention art. II; see Bautista, 396 F.3d at 1302.  If the four prerequisites are met, and the party opposing enforcement has no valid affirmative defense under the Convention, then the district court "must order arbitration."  Id. at 1294-95.

AO 72A
(Rev.8/82)

2.      The Convention Supersedes the McCarran-Ferguson Act

In view of the Eleventh Circuit's emphasis on the primacy of the

Convention, the Court concludes that the Convention supersedes the McCarran-

Ferguson Act.  In the first place, the Eleventh Circuit's mandate that the "[t]he

Convention must be enforced according to its terms over all prior inconsistent

rules of law," Ind. Risk Insurers, 141 F.3d at 1441 (citations and quotation

omitted), leaves little room for courts to recognize a defense under a federal

law, such as the McCarran-Ferguson Act, which was enacted prior to the

implementation of the Convention and which has not been recognized as a

universal defense under the Convention.[9]

---

[9] The Eleventh Circuit's statement in Industrial Risk Insurers also undermines
PSC's reliance on Stephens v. American International Insurance Co., 66 F.3d 41 (2d Cir.
1995).  In Stephens, the Second Circuit held that the McCarran-Ferguson Act, although
it was passed prior to the implementation of the Convention in 1970, nevertheless
superseded the Convention insofar as it applied to preserve state-law defenses to
arbitration clauses contained in insurance contracts.  Id. at 45.  Reasoning that the
Convention was not self-executing, the Court held that it was "simply inapplicable" to
cases in which the McCarran-Ferguson Act applied.  But in view of the Eleventh
Circuit's mandate that "[t]he Convention must be enforced according to its terms over all
prior inconsistent rules of law," this Court finds the reasoning of Stephens unpersuasive.
And in any event, the Second Circuit has since recognized some tension between its
reasoning in Stephens and the legislative history of the McCarran-Ferguson Act.  See
Stephens v. Nat'l Distillers and Chem. Corp., 69 F.3d 1226, 1231 n.5 (2d Cir. 1995)
(declining to address whether McCarran-Ferguson Act is limited to interstate, and not
foreign commerce, but noting that "there is some indication in the legislative history of
the McCarran-Ferguson Act that it was intended to apply only to [Interstate] Commerce

Moreover, the Eleventh Circuit's reasoning in Bautista appears to similarly foreclose PSC's defense under the McCarran-Ferguson Act.  In Bautista, the Eleventh Circuit held that the state-law defense of unconscionability is not available as a defense under the "null and void" provision of the Convention.  In doing so, the court explained that the Convention's "null and void" clause "limits the bases upon which an international arbitration agreement may be challenged to standard breach-of-contract defenses"— such as fraud, mistake, duress, and waiver—"that can be applied neutrally on an international scale." Bautista, 396 F.3d at 1302 (quoting DiMercurio v. Sphere Drake Ins. PLC, 202 F.3d 71, 79-80 (1st Cir. 2000). Emphasizing "the unique circumstances of foreign arbitration," the court held that domestic defenses to arbitration may only be recognized under the Convention "if there exists a precise, universal definition . . . that may be applied effectively across the range of countries that are parties to the Convention." Id. (citing Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 629, 105 S. Ct. 3346, 87 L. Ed. 2d 444 (1985)).  Because

_____

Clause legislation").

24

unconscionability, the court concluded, is not a defense capable of universal

application, it is not recognized as a defense under the Convention.  Id.

Significantly, Bautista refused to recognize the state-law defense of

unconscionability even though the defense is available under Section 1 of the

FAA as a defense to enforcement of a domestic arbitration clause.[10]  Thus, the

court held that this provision of the FAA, at least with respect to international

arbitration agreements, is superseded by the provisions of the Convention.

Applying this reasoning, it is the view of this Court that the Convention must

similarly supersede PSC's defense under O.C.G.A. § 9-9-2(c)(3).  Although

PSC contends that the McCarran-Ferguson Act operates to carve out this state

law defense despite the Convention, Bautista implicitly rejected similar

reasoning in concluding that the defense of unconscionability, while normally

available under the FAA, is nevertheless superseded by the Convention in the

context of international arbitration agreements.  For the same reason, the

---

[10] Under the FAA, arbitration agreements are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of the contract." 9 U.S.C. § 2.  The Eleventh Circuit has recognized that the state-law defense of unconscionability, as a general defense to the enforcement of any contract, may be asserted as a defense to enforcement of an arbitration clause under the FAA.  See Caley, 428 F.3d at 1378; Jenkins v. First Am. Cash Advance of Ga., LLC, 400 F.3d 868, 875-76 (11th Cir. 2005).

25

McCarran-Ferguson Act's preservation of state insurance law defenses does not apply in the context of international arbitration because the text of the Convention is supreme.

Finally, this Court's conclusion that the Convention prevails over the McCarran-Ferguson Act is consistent with the policies recognized in the context of international commerce that strongly favor enforcement of arbitration clauses. See, e.g., Lipcon v. Underwriters at Lloyd's, London, 148 F.3d 1285, 1294 (11th Cir. 1998) (noting importance of respecting international comity and ensuring the orderliness and predictability that are essential to any international business transaction in enforcing international agreement). Indeed, on at least three occasions, the Supreme Court has relied on the strong policy of international comity and predictability in enforcing an international agreement. See Scherk, 417 U.S. at 516; Mitsubishi Motors Corp., 473 U.S. 614; Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer, 515 U.S. 528, 115 S. Ct. 2322, 132 L. Ed. 2d 462 (1995). And on two of these occasions, the Court has enforced an international arbitration agreement *even though a similar agreement would be unenforceable in the domestic context*. See Scherk, 417 U.S. at 516; Mitsubishi Motors Corp., 473 U.S. 614.

26

In <u>Scherk</u>, for example, the Supreme Court held that, despite Section 29 of the 1934 Securities Act, which was construed at the time to render arbitration agreements in securities agreements void, an arbitration clause in a "truly international agreement" was nonetheless enforceable because "[s]uch a contract involves considerations and policies significantly different" from those in the domestic context. <u>Id.</u> at 515. Several years earlier, the Supreme Court had held in <u>Wilko v. Swan</u>, 346 U.S. 427, 74 S. Ct. 182, 98 L. Ed. 168 (1953), that predispute arbitration agreements in securities contracts were void under the no-waiver provisions of the Securities Act.[11] But the Court in <u>Scherk</u> distinguished the international character of the agreement at issue in that case from the domestic agreement at issue in <u>Wilko</u>. <u>Scherk</u>, 417 U.S. at 516-518. Because "in the absence of the arbitration provision considerable uncertainty

---

[11] The Supreme Court has since overruled its decision in <u>Wilko</u>, holding that the 1934 Securities Act does not prohibit the enforcement of arbitration agreements contained in securities transactions. <u>See</u> <u>Rodriguez de Quijas v. Shearson/American Exp., Inc.</u>, 490 U.S. 477, 484, 109 S. Ct. 1917, 104 L. Ed. 2d 526 (1989) (holding that <u>Wilko</u> "was incorrectly decided and is inconsistent with the prevailing uniform construction of other federal statutes governing arbitration agreements in the setting of business transactions"). As reflected in subsequent Supreme Court decisions, however, its treatment of "truly international agreements" to arbitrate as distinct from domestic agreements applies with as much force today as it did in <u>Scherk</u>. <u>See</u> <u>Mitsubishi Motors Corp.</u>, 473 U.S. 614; <u>Vimar Seguros y Reaseguros</u>, 515 U.S. 528; <u>see</u> <u>also</u> <u>Lipcon v. Underwriters at Lloyd's, London</u>, 148 F.3d 1285, 1294 (11th Cir. 1998).

27

existed at the time of the agreement, and still exists, concerning the law

applicable to the resolution of disputes arising out of the contract," the Court

reasoned that an international agreement to arbitrate is "an almost indispensable

precondition to achievement of the orderliness and predictability essential to

any international business transaction." Id. at 516.  An arbitration agreement,

the Court reasoned, also "obviates the danger that a dispute under the agreement

might be submitted to a forum hostile to the interests of one of the parties or

unfamiliar with the problem area involved." Id.  Finding it unnecessary to

reach the issue of whether the Convention "would require of its own force" that

the arbitration agreement be enforced, the Court concluded that those distinctly

international concerns alone mandated enforcement of the arbitration clause at

issue.  Id. at 520 & n.15.  The Court explained:

> A parochial refusal by the courts of one country to
> enforce an international arbitration agreement would
> not only frustrate these purposes, but would invite
> unseemly and mutually destructive jockeying by the
> parties to secure tactical litigation advantages.  In the
> present case, for example, it is not inconceivable that
> if Scherk had anticipated that Alberto-Culver would
> be able in this country to enjoin resort to arbitration he
> might have sought an order in France or some other
> country enjoining Alberto-Culver from proceeding
> with its litigation in the United States. Whatever

28

> recognition the courts of this country might ultimately
> have granted to the order of the foreign court, the
> dicey atmosphere of such a legal no-man's-land
> would surely damage the fabric of international
> commerce and trade, and imperil the willingness and
> ability of businessmen to enter into international
> commercial agreements.

Id. at 516-17.

Several years later, in Mitsubishi Motors Corp., the Court again enforced an international agreement to arbitrate—even while assuming it would not be enforceable in the domestic context.  473 U.S. 629.  In that case, the Court addressed whether a claim under the Sherman Act alleging antitrust violations could be litigated in an international arbitral forum.  The Second Circuit had held that such a claim could not be brought in an international arbitration forum because "the pervasive public interest in enforcement of the antitrust laws, and the nature of the claims that arise in such cases, combine to make . . . antitrust claims . . . inappropriate for arbitration."  Id. (citing Am. Safety Equip. Corp. v. J.P. Maguire & Co., 391 F.2d 821 (2d Cir. 1968)).  Finding it "unnecessary to assess the legitimacy of the American Safety doctrine as applied to agreements to arbitrate arising from domestic transactions," the Court held that the

29

international nature of the transaction alone justified its enforcement, even

assuming its illegality in the domestic context.  The Court explained:

> [T]he concerns of international comity, respect for the
> capacities of foreign and transactional tribunals, and
> sensitivity to the need of the international commercial
> system for predictability in the resolution of disputes
> require that we enforce the parties' agreement, even
> assuming that a contrary result would be forthcoming
> in a domestic context.

Id.

Relying on its previous decision in Scherk, the Court admonished that "it

will be necessary for national courts to subordinate domestic notions of

arbitrability to the international policy favoring commercial arbitration."  Id. at

639.[12]

---

[12]  The Court in Mitsubishi Motors also noted that, in Scherk, "the Court dealt, *arguendo*, with an exception to arbitrability grounded in express congressional language," whereas in Mitsubishi Motors, the exception was "judicially implied."  473 U.S. at 639 n.21.  Nonetheless, because of the Convention's broad scope, the Court noted that a clear statement by Congress would be required for a federal statute to be construed to limit the Convention's reach.  The Court explained:

> The utility of the Convention in promoting the process of
> international commercial arbitration depends upon the
> willingness of national courts to let go of matters they
> normally would think of as their own.  Doubtless, Congress
> may specify categories of claims it wishes to reserve for
> decision by our own courts without contravening this
> Nation's obligations of the Convention.  But we decline to

30

Finally, in <u>Vimar Seguros y Reaseguros</u>, the Court enforced an international arbitration clause in the context of a challenge to its enforceability under the Carriage of Goods by Sea Act.  515 U.S. at 530 (citing 46 U.S.C.A. § 1300 <u>et</u> <u>seq.</u>).  In that case, the Court interpreted a provision of the Carriage of Goods by Sea Act, which rendered void any provision in maritime contracts that lessens the liability of a carrier of goods, as not conflicting with the FAA or the Convention.  Stating that "it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard . . . two statutes [as] capable of co-existence," <u>id.</u> at 533, the Court relied, in part, on its decisions in <u>Scherk</u> and <u>Mitsubishi</u> to find that the policy in favor of enforcing international agreements counseled against construing the Carriage of Goods by Sea Act in a

---

> subvert the spirit of the United States' accession to the Convention by recognizing subject-matter exception where Congress has not *expressly directed* the courts to do so.

<u>Id.</u> (emphasis added).

Although the McCarran-Ferguson Act has been interpreted, in essence, to "expressly direct" state insurance laws to reverse preempt provisions of the FAA, <u>see</u> <u>McKnight</u>, 358 F.3d 854, the McCarran-Ferguson Act was enacted prior to Congress's implementation of the Convention.  Neither the McCarran-Ferguson Act itself, nor any Congressional Act enacted subsequent to the Convention gives any indication that Congress has "expressly directed" a subset of state insurance laws to reverse preempt the broad policy expressed in the Convention of enforcing international arbitration agreements.

31

manner that rendered an international arbitration clause unenforceable.  The

Court admonished:  "If the United States is to be able to gain the benefits of

international accords and have a role as a trusted partner in multilateral

endeavors, its courts should be most cautious before interpreting its domestic

legislation in such manner as to violate international agreements."  Id. at 539.[13]

―――――――――――――――

[13] The Court's decision in Vimar Seguros y Reaseguros lends support to the district court decisions which, when confronted with the issue here, construed the McCarran-Ferguson Act as applicable only to domestic, and not international, contracts of insurance. See supra n.5; e.g., West of England Ship Owners, 1992 WL 37700, at *4-5; Antillean Marine Shipping Corp., 2002 WL 32075793, at *3 (stating that the McCarran-Ferguson Act "was intended to apply only to interstate commerce, and not foreign commerce").

Moreover, in American Ins. Assoc. v. Garamendi, 539 U.S. 396, 123 S. Ct. 2374, 156 L. Ed. 2d 376 (2003), the Supreme Court applied similar reasoning in holding that, despite the McCarran-Ferguson Act, California's Holocaust Victim Insurance Relief Act was preempted because it impermissibly interfered with the President's power to make executive agreements.  Id. at 429.  In doing so, the Court noted that the McCarran-Ferguson Act was "directed to implied preemption by *domestic commerce legislation* [and] cannot sensibly be construed to address preemption by executive conduct in foreign affairs."  Id. at 428 (emphasis added); see also Blackfeet Nat'l Bank v. Nelson, 171 F.3d 1237, 1244 n.10 (11th Cir. 1999) (noting that "federal laws involving issues of paramount national concern—such as the Foreign Sovereign Immunities Act (FSIA) and the Civil Rights Act of 1964 (Title VII)—have been held to be exempt from the reverse preemption provisions of McCarran-Ferguson," but holding that the Bank Act does not reflect the same degree of national concern as FSIA or Title VII, and thus does not supersede state insurance laws); cf. F.T.C. v. Travelers Health Assoc., 362 U.S. 293, 300, 80 S. Ct. 717, 4 L. Ed. 2d 724 (1960) (holding that Federal Trade Commission could regulate advertising activities of Nebraska insurance company which conducted business nationwide despite Nebraska provision specifically directed towards insurance companies that prohibited deceptive trade practices, and stating that "it is clear that Congress viewed state regulation of insurance solely in terms of regulation by the law of the State where occurred the activity sought to be regulated  . . [and not] activities carried on beyond its own borders").

The Eleventh Circuit, sounding the drum of <u>Scherk</u>, <u>Mitsubishi Motors</u>, and <u>Vimar Seguros</u>, has also emphasized the policy of enforcing international agreements despite an asserted tension with domestic law.[14]   In <u>Lipcon v. Underwriters at Lloyd's, London</u>, 148 F.3d 1285, 1294 (11th Cir. 1998), for example, the Eleventh Circuit joined seven other circuits in holding that, despite "strong support in the plain language of the anti-waiver provisions" of the 1933 Securities Act for holding international choice-of-law clauses in securities agreements unenforceable, "precedent and policy considerations" nevertheless

---

In view of the conflict-avoidance rule of <u>Vimar Seguros y Reaseguros</u>, and in view of <u>Garamendi</u>'s construction of the McCarran-Ferguson Act as directed towards preempting only *domestic* laws, it may be argued that McCarran-Ferguson Act has no application in this case.  But because this Court concludes that both the Convention and policy favoring the enforcement of international arbitration agreements supersede any contrary mandate of the McCarran-Ferguson Act, it need not decide the broader question of whether the McCarran-Ferguson Act does not apply to international contracts of insurance at all.

[14] Courts outside of the Eleventh Circuit have similarly relied on these policies in enforcing international agreements.  See <u>J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.</u>, 863 F.2d 315, 319 (4th Cir. 1988) (noting <u>Mitsubishi Motors</u>' emphasis on the federal policy in favor of arbitration that applies "with special force in the field of international commerce"); <u>Lim v. Offshore Specialty Fabricators, Inc.</u>, 404 F.3d 898, 904 (5th Cir. 2005) (holding that Convention preempted Louisiana statute disfavoring arbitration clauses in employment contracts); <u>Sphere Drake Ins. PLC v. Marine Towing, Inc.</u>, 16 F.3d 666, 670 (5th Cir. 1994) (affirming order to compel international arbitration in insurance dispute despite Louisiana law).

require their presumptive enforcement.  Id. at 1292.  In coming to its

conclusion, the court relied principally on the Supreme Court's treatment of

international agreements as "*sui generis*," under "a framework designed

specifically for the international commercial context."  Id. at 1292, 1294.  Thus,

even though the Supreme Court has indicated that a clause purporting to apply

foreign law in a domestic securities agreement would be invalid under the

Securities Act, see id. at 1294 (citing Shearson/Am. Express, Inc. v. McMahon,

482 U.S. 220, 107 S. Ct. 2332, 96 L. Ed. 2d 185 (1987)), the court in Lipcon

distinguished that concern because it was expressed in a case that "involved the

enforceability of an arbitration clause in a *domestic* securities agreement."  Id.

(emphasis in original).  Rather, because "[t]he Court consistently has treated

'truly international agreements' differently than domestic transactions, which

indisputably are subject to the anti-waiver provisions of the securities laws," the

Eleventh Circuit concluded that the English choice-of-law provision in the

parties international agreement was enforceable.  Id.

    In sum, several principles convince this Court that the Convention

supersedes the McCarran-Ferguson Act.  First, the Eleventh Circuit has

recognized that the Convention prevails over previously enacted inconsistent

rules of law.  Second, the Eleventh Circuit has limited the defenses available in international arbitration to those recognized by the Convention.  And finally, the Supreme Court has repeatedly held that the importance of international comity and ensuring predictability and orderliness in international commerce warrant the enforcement of international agreements to arbitrate, even in contexts where a similar agreement would be unenforceable in the domestic context.  In view of these authorities, the Court concludes the Convention supersedes the McCarran-Ferguson Act.

In coming to this conclusion, the Court does not adopt the reasoning of West of England Ship Owners, which concluded that the McCarran-Ferguson Act, as it was originally drafted, does not apply to international agreements.  1992 WL 37700, at *4-5.  The court in West of England Ship Owners relied principally on Triton, another district court decision, for the proposition that the McCarran-Ferguson Act applies only to interstate, and not to international, agreements.  However, as PSC correctly points out, Triton held that a dispute between a Bermuda insurance company and a Texas shipowner was subject to arbitration, not because of the domestic/international distinction, but for an entirely different reason.  Triton held that "[a] disputed claim is not the business

35

of insurance" and thus Louisiana's anti-arbitration insurance laws did not by operation of the McCarran-Ferguson Act preempt the federal policy in favor of arbitration.

Triton is thus in conflict with the Eleventh Circuit's decision in McKnight—which came to the opposite conclusion in holding that O.C.G.A. § 9-9-2(c)(3) *is* a regulation of the business of insurance and thus reverse preempts the FAA.  See McKnight,  358 F.3d at 858-59.  Moreover, Triton did not discuss the Convention, or rely on it as authority, in enforcing the parties' agreement.  Indeed, that the arbitration agreement was international as opposed to domestic appears to be of little significance to the court's decision in Triton. Triton therefore provides an unstable foundation for the proposition for which it was cited in West of England Ship Owners and its progeny—that the McCarran-Ferguson Act, by its own terms, distinguishes between domestic and international commerce.  As such, the Court finds little persuasive value in these cases.

Instead, as explained above, it is the view of this Court that—whatever Congress's original intent in adopting the McCarran-Ferguson Act—Congress's subsequent adoption of the Convention, which expresses a strong international

36

policy in favor of enforcing commercial arbitration agreements and

concomitantly limits the affirmative defenses to only those universally

recognized under the Convention, supersedes state-based anti-arbitration

defenses otherwise available in the domestic context by operation of the

McCarran-Ferguson Act.

       2.    <u>The Parties' Arbitration Agreement is Enforceable Under the Convention</u>

Having concluded that the parties' arbitration agreement is controlled by

the Convention, the Court must now conduct its "very limited inquiry" to

determine whether arbitration is required.  <u>Bautista</u>, 396 F.3d at 1294.

Applying the <u>Bautista</u> inquiry to the case at bar, it is clear that the Convention

requires enforcement of the arbitration agreement at issue.  First, the four

jurisdictional prerequisites are met: (1) the CCI Policy and its arbitration clause

are in writing; (2) the agreement calls for arbitration in England, a signatory of

the Convention; (3) the agreement arises out of a "commercial" legal

relationship; and (4) a party to the agreement—namely, Goshawk—is a citizen

of England and not the United States.   Indeed, PSC has not disputed that all

four prerequisites are met in this case.

Moreover, PSC has not raised any internationally applicable affirmative defense—such as fraud, mistake, duress, or waiver—that is recognized under the Convention.  Rather, PSC has rested its entire defense to enforcement on the ground that Georgia law, and not the Convention, applies in this case by operation of the McCarran-Ferguson Act.  Because PSC's state law defense is outside the scope of the affirmative defenses allowed under the Convention, and because the "very limited inquiry" required under Bautista forecloses any consideration of PSC's defense, the Court concludes that the international arbitration agreement at issue in this case must be enforced.

In sum, the Court concludes that the Convention supersedes the McCarran-Ferguson Act and requires arbitration in this case.  Accordingly, Goshawk's Motion to Compel Arbitration is hereby **GRANTED.**

## II.    PSC's Motion to Dismiss

In view of this Court's decision to compel arbitration, the Court concludes that PSC's Motion to Dismiss raises issues properly for arbitrators. Before considering the merits of a motion, a court must first decide whether the motion is one for an arbitrator or a court to resolve.  See Jenkins, 400 F.3d at 876.  Courts may not consider defenses to the case generally, as opposed to

specific challenges to an arbitration agreement, because these are properly reserved for arbitrators.  Id. (citing Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 403-04, 87 S. Ct. 1801, 18 L. Ed. 2d 1967 (1967)).  In support of its Motion to Dismiss, PSC argues that "Goshawk's averments are deficient because they are not stated with the requisite particularity that is required by Federal Rule of Civil Procedure  9(b). . . ."  (See Def.'s Br. in Supp. of Mot. to Dismiss [10-2] at 2 (emphasis removed).)  PSC's contentions go to defending the case generally.  As such, they are proper for an arbitrator, not a federal court, to decide.  Accordingly, Defendant's Motion to Dismiss [10] is hereby **DENIED**, with permission to refile consistent with the rules of arbitration.

## Conclusion

For the foregoing reasons, Defendant's Motion to Dismiss [10] is hereby **DENIED,** with permission to refile consistent with the rules of arbitration. Plaintiff's Motion to Compel [18] is hereby **GRANTED.**  The Clerk of Court is **DIRECTED** to **ADMINISTRATIVELY CLOSE** this case pending the completion of the arbitration between the parties.

39

**SO ORDERED** this __18th__ day of December, 2006.


RICHARD W. STORY
UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)